J. GRANT FARMS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAMES A. GRANT and M. JEAN GRANT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
J. Grant Farms, Inc. v. Commissioner
Docket Nos. 29168-82, 29169-82.
United States Tax Court
T.C. Memo 1985-174; 1985 Tax Ct. Memo LEXIS 456; 49 T.C.M. (CCH) 1197; T.C.M. (RIA) 85174; April 8, 1985. Patrick B. Mathis and John J. Vassen, for the petitioners. Frank Agostino, for *457 the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Taxpayer
Taxable year
Deficiency
James A. Grant and
M. Jean Grant
1979
$2,587
James A. Grant and
M. Jean Grant
1980
1,851
J. Grant Farms, Inc.
Year ending July 31, 1979
1,633
J. Grant Farms, Inc.
Year ending July 31, 1980
2,550
After concessions, the issues for decision are: (1) whether the individual petitioners, James A. Grant and M. Jean Grant, may exclude from gross income under section 119[1] income equal to the fair rental value of the residence they occupied, which was owned by the petitioner employer-corporation, and likewise exclude the cost of utilities of the residence furnished by the corporation for the taxable years 1979 and 1980; and (2) whether petitioner J. Grant Farms, Inc., was entitled to deduct depreciation and utility expenses related to the lodging provided to the individual petitioners for the taxable years ending July 31, 1979, and July 31, 1980, under the provisions of sections 162 and 167, respectively. *458 FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and accompanying exhibits are so found and incorporated herein by reference. James A. Grant and M. Jean Grant, husband and wife (also hereinafter referred to as petitioners or Mr. Grant and Mrs. Grant), were residents of Charleston, Illinois, during the taxable years 1979 and 1980, and at the time the petition in this case was filed. Mr. Grant has resided in what is presently the J. Grant Farms, Inc., farmstead since 1949. In 1976, petitioners incorporated their family-owned farm into J. Grant Farms, Inc. (also hereinafter referred to as the corporation), which is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Charleston, Illinois. Mr. and Mrs. Grant each own 500 shares of the corporation, representing all of the outstanding shares of J. Grant Farms, Inc.
Petitioners timely filed their joint Federal income tax returns for the taxable years 1979 and 1980 with the Internal Revenue Service Center in Kansas City, Missouri. The corporation timely filed Federal income tax returns for the taxable years ending July 31, 1979, and July 31, 1980, at *459 the same location. During the taxable year ending July 31, 1979, the corporation owned 50 acres of land. During the taxable year ending July 31, 1980, the corporation owned 110 acres of land. During the taxable periods at issue, the corporation rented 263 acres of farmland from Mr. Grant. During the taxable years ending July 31, 1979, and July 31, 1980, the corporation also leased 704 acres and 584 acres, respectively, of farmland under "share-corp" arrangements. By oral agreement between the landlords and the corporation, the gross proceeds of crops sold from the farmland and the cost of seed and fertilizer were shared on an equal basis. The landlords paid the property taxes related to the property. The landlords of the various properties were: Landlord
Relationship to Petitioners
Margaret and Katherine Grant
Mr. Grant's sisters
Jim Grant
Petitioner
Jim Grant
Petitioner
Dorothy Grant
Mr. Grant's sister
Jean Grant
Petitioner
Mary and Berniece Grant
Mr. Grant's sisters
Emily Westoff
None
Mr. Grant leased farm equipment to the corporation under a written lease dated December 31, 1976. The lease was updated annually by revised listings of equipment *460 owned by Mr. Grant, depending on the acquisition and disposition of equipment during the preceding year. The fair market value of the leased equipment was $139,100 in the taxable year 1979, and $129,383 in the taxable year 1980. The corporation owned equipment with a fair market value of $7,847 in the taxable year ending July 31, 1979, and $9,806 in the taxable year ending July 31, 1980. The leased and corporate equipment was stored on the corporation's farmstead. Insurance is available to cover the risks of loss arising from theft, or other disaster, on the farm. The corporation purchased such insurance. During the entire period at issue, the corporation was engaged in the farming of grain, which is a business with a low profit margin that requires efficient operation. The corporation produced the following crops: Taxable Year
Grain
Bushels
Year ending July 31, 1979
Corn
54,983
Year ending July 31, 1979
Soybeans
11,270
Year ending July 31, 1980
Corn
52,260
Year ending July 31, 1980
Soybeans
12,410
During the taxable years ending July 31, 1979, and July 31, 1980, the corporation sold grain for $224,472 and $232,256, respectively. At the end *461 of the taxable year ending July 31, 1979, the corporation had 3,300 bushels of soybeans and 3,500 bushels of corn stored in bins upon the corporate property. At the end of the taxable year ending July 31, 1980, the corporation had 3,500 bushels of soybeans and 3,800 bushels of corn stored in bins upon the corporate property. The approximate value of the stored grain was $61,272 and $56,505 for the taxable years ending July 31, 1979, and July 31, 1980, respectively. At all times relevant hereto, commercial grain elevators operated in the area in which grain was stored for a fee. The corporation's grain business entailed the planting, cultivation, harvesting, drying, storage, and sale of corn and soybeans.The grain operation begins with planning for the planting of the year's crops; purchasing of seed corn, soybeans, herbicides, and fertilizer; and the maintenance of equipment in preparation for the planting season. Corn and soybeans are planted during the spring of the year. In planting, soil and weather conditions are carefully monitored in order to plant the crops as close as possible to the optimum planting period. Planting is not carried out on a continual, day-to-day basis *462 because of delays caused by inclement weather. During the planting season, there are days in which only a few hours are available for planting. Under ideal conditions, the acreage owned, rented, or leased by the corporation could be planted in ten 10-hour days, but such conditions seldom occur. During the growing season, the crops are monitored for insects and weed infestation, with cultivation of the corps, spraying for weeds, and insect control continuing throughout this period. Fluctuating conditions affect cultivation in a fashion similar to the manner in which they affect planting, i.e., cultivation may not be possible for more than a few hours on any one particular day. Under ideal conditions, cultivation of the land worked by the corporation's employees could be accomplished in ten to fifteen 10-hour days. Cultivation, however, follows the inspections and monitoring, and is, therefore, done throughout the growing season. Harvesting of crops begins in September and ordinarily runs through November, although it may extend for a longer period. After grain is harvested, it is dried in grain storage bins. Soybeans are air dried, while the corn is machine dried.The drying *463 process involves the drying of grain with electric motors pushing air, supplemented with gas or electric heat, through the corn. The temperature is monitored by a thermostat similar to that found in a home heating system. The drying process may last from 6 weeks to 3 months. In the event that the electricity fails, the drying motors in the drying bins do not restart automatically, but must be restarted manually. If the motors stop, the drying process is delayed, but not stopped. During the drying process, the grain bins are monitored several times each day to see whether the optimal moisture content has been attained. If the moisture content is too high, the crops will rot in storage; if too low, the corporation will incur unnecessary drying expense and shrinkage, with consequent reduced sale proceeds. During the drying season, Mr. Grant checked the drying bins several times each day for continued operation and moisture content, with a final check before going to bed. Once the grain is dried, it is stored in a grain elevator or storage bin until sale; in this case, such storage was primarily in the corporation's storage bins. During the years 1979 and 1980, the corporation *464 was also engaged in the breeding and farrowing of sows and the sale of piglets. The corporation owned an average of eight purebred breeding sows and a purebred boar. During the taxable years ending July 31, 1979, and July 31, 1980, the corporation had gross hog sales in the amounts of $12,593 and $6,613, respectively. The corporation's hog operation involved 8 to 10 sows and their offspring, which were hand-fed twice a day throughout the year. The sows were farrowed two times per year, normally in January or February and July. During the time of farrowing, the sows and pigs were watched on an around-the-clock basis. There is a substantial annual snowfall in the area of the corporation's farms, making the livestock periodically inaccessible unless there is an on-site manager. In the event of a loss of power and heat, confined hogs and pigs, such as those of the corporation, may freeze to death. Without a manager present to insure that the heaters in the facilities continue to operate, the entire herd could be lost. During the years in dispute, petitioners' children were actively involved in the local 4-H program, a youth educational program which teaches children how to be *465 farmers. During the years in dispute, two of the Grant children raised 10 of the average head of 80 to 90 hogs as their 4-H project, and showed the hogs at the county fair. In such a project, the children are expected to do most of the work in raising the hogs. The corporation employed 11 people during the taxable year 1978, 13 people in the taxable year 1979, and 12 people in the taxable year 1980. The corporation, which was owned entirely by petitioners, employed Mr. Grant as sole manager and operator of the corporation's farm properties under an employment contract dated December 31, 1976, as extended in August 1977, 1978, and 1979. Mr. Grant's responsibilities included making decisions as to the management and operation of the farm and devotion of his "full time, energy, skills and effort to the furtherance of the business of the company." Under the terms of the employment contract, the corporation provided living accommodations to Mr. Grant and his family, and paid all of the expenses of such accommodations. Mr. Grant was required by the contract to occupy the accommodations provided. The reasons provided in the contract for requiring Mr. Grant to live on the premises *466 were so that Mr. Grant could manage the general operations of the farm; manage the feeding, watering, breeding, farrowing, and general supervision of livestock on the farm property; secure equipment owned and leased by the corporation; supervise the drying and storing of grain; and perform all of these duties on a 24-hour-per-day basis. At all times relevant to this case, petitioners and seven of their children lived on the corporation's land in a residence furnished to them by the corporation. The residence was built in 1977 at a cost of $85,816, to replace a residence that burned in 1976, and contains 2,400 square feet of air-conditioned living space. The corporation's land is located 3 miles from Humboldt, Illinois, 8 miles from Mattoon, Illinois, 8 miles from Charleston, Illinois, and 10 miles from Arcola, Illinois. At all times relevant hereto, there were residences comparable to the one in which petitioners resided available for rental in Charleston and Mattoon. In Coles County, Illinois, where the corporation's farmstead, rented land, and share-cropped land are located, farmers generally reside on the farm when valuable farm equipment and a grain-drying operation are *467 on the premises. The presence of a manager-operator on the property for 24 hours a day provides security for the equipment; insures continued operation of the grain dryers; and allows for a more efficient operation. Further, a swine operation requires 24-hour-a-day management during farrowing season. On September 15, 1982, the Commissioner timely issued statutory notices of deficiency to petitioners and the corporation, in the amounts and for the taxable years listed above. The Commissioner determined that petitioners received distributions from the corporation equal to the fair rental value of the residence they occupied plus utilities provided for the residence by the corporation. In addition, he determined that petitioners were not entitled to exclude such distributions under the provisions of section 119. The Commissioner determined that the corporation was not entitled to deduct the depreciation and utilities related to the residence occupied by petitioners. ULTIMATE FINDINGS OF FACT Petitioner James A. Grant was required to be available for duty at all times in connection with his responsibilities as operator-manager of the corporation's farm operation. It was both *468 necessary, and a condition of his employment, that petitioner James A. Grant reside upon the farm premises in order to properly perform the duties of his employment. Petitioners resided on the farm for the convenience of the employer-corporation. OPINION After concessions, the issues for decision are: (1) whether the individual petitioners may exclude from gross income under section 119 income equal to the fair rental value of the residence they occupied, which was owned by the petitioner employer-corporation, and likewise exclude the cost of utilities of the residence furnished by the corporation; and (2) whether petitioner corporation was entitled to deduct depreciation and utility expenses related to the lodging provided to the individual petitioners under the provisions of sections 162 and 167, respectively. The Commissioner's determination in his statutory notice of deficiency is presumptively correct, and petitioners have the burden of disproving each individual adjustment. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). During the taxable years at issue, *469 the corporation provided lodging to petitioners without charge. The fair market value of such lodging constituted dividend income to petitioners and must be included in their gross income under section 301, unless specifically excluded. [2]
Under section 119, the value of lodging [3] furnished to an employee, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer is excluded from gross income, but only if the employee is required to accept the lodging on his employer's business premises as a condition of his employment. Sec. 1.119-1(b), Income Tax Regs., amplifies the requirements for exclusion: The value of lodging furnished to an employee by the employer *470 shall be excluded from the employee's gross income if three tests are met: (1) The lodging is furnished on the business premises of the employer, (2) The lodging is furnished for the convenience of the employer, and (3) The employee is required to accept such lodging as a condition of his employment. The requirement of subparagraph (3) of this paragraph that the employee is required to accept such lodging as a condition of his employment means that he be required to accept the lodging in order to enable him properly to perform the duties of his employment. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty at all times or because the employee could not perform the services required of him unless he is furnished such lodging. If the tests described in subparagraphs (1), (2), and (3) of this paragraph are met, the exclusion shall apply irrespective of whether a charge is made, or whether, under an employment contract or statute fixing the terms of employment, such lodging is furnished as compensation. * * * *471 The parties agree that the first condition, that the lodging be on the employer's premises, and the second condition, that the provision of such lodging be for the convenience of the employer, are met. The parties disagree, however, on whether the third condition is met. Petitioners assert that Mr. Grant must be available for duty at all times, both to perform his duties under his employment contract, and to obtain the optimum financial return. Respondent contends that it is unnecessary for Mr. Grant and his family to live on the corporation's land on the basis that: (1) many farmers do not live on the property that they farm; (2) few, if any, duties require the presence of a manager for 24 hours a day; and (3) Mr. Grant's duties could be performed just as easily if he commuted from a residence in one of the nearby communities. Respondent attempted, on brief, to contend that alternate grounds for disallowing the exclusion under section 119 were either that the corporation was not an independent entity or that the arrangement described above was, in some fashion, an attempt at tax avoidance under section 269. Neither one of these grounds was contained in either the notices of *472 deficiency or the answers to the petitions.Further, to address these issues at this late date would be to allow respondent, in effect, to change his position subsequent to trial without affording petitioners the opportunity to refute these contentions. We will not, therefore, consider these grounds. Seligman v. Commissioner, 84 T.C.     (Feb. 12, 1985). The issue before us is, therefore, whether petitioners were required to accept lodging furnished to them as a "condition of * * * employment." The proper inquiry is not whether the employee was contractually required to reside on the employer's premises, or whether housing was available nearby, but whether the lodging was furnished to petitioners because the nature of Mr. Grant's job required that he "be available for duty at all times." Sec. 1.119-1(b), Income Tax Regs. The question is primarily one of fact to be resolved by a consideration of all of the circumstances before us. Three experts testified [4] on the issue of whether a resident manager was indispensable to the operation of the corporation's *473 farm. Louis Christen, an agricultural extension advisor for Coles County for 26-1/2 years, is thoroughly and personally familiar with the particular farm at issue. Coles County is the location of all of the property farmed by the corporation. His opinion was that the constant presence of a manager was both "highly desirable" and "highly necessary" in order to make the maximum profit, particularly in the last several years when good management has made the difference between a small profit and no profit at all.Mr. Christen lives on a farm where he conducts drying operations and stores equipment, and has a tenant farmer who does not live on the property. Mr. Christen stated that if he moved to town, a tenant would be required to live on the farm. Royce Marble is senior vice-president and trust officer at the Charleston National Bank responsible *474 for the management of approximately 15,000 acres of farm land, most of which is leased on a "share-crop" basis. If a farm has a residence and improvements such as grain bins and machine sheds, the bank routinely requires that the tenant live upon the property. A "courtesy rent" of between $100 and $300 a year is normally charged. He also testified that having a resident farmer improves the bottom line. The bank does not build a residence upon a vacant property if there are no improvements upon it. Respondent's expert witness, Elmer E. Rankin, has been an agricultural extension advisor for Sangamon County, Illinois, since November of 1980, and testified pursuant to a subpoena served upon him by respondent. He testified that, in general, most land owners do not live on their farms, and that the majority do not require their tenants to live on the farms. Upon cross examination, however, he conceded that he knew of no nonresident farmers who had either grain drying operations or large amounts of equipment and supplies stored on the premises. He also conceded that the presence of a resident manager would make the farm operate more efficiently. Although he could not recommend a *475 swine operation to a farmer with as large a grain operation as petitioners, such a project would be appropriate because a 4-H project was involved. This evidence is sufficient to sustain petitioners' burden of proof, thus distinguishing this case from Caratan v. Commissioner,52 T.C. 960 (1969), revd. 442 F.2d 606 (9th Cir. 1971). We find as a fact that petitioners were required to reside on the corporation's farmstead in order to properly manage and operate the farm, and that occupying the residence upon the farmstead was a condition of Mr. Grant's employment. A farming operation of the complexity set forth above is not a 9-to-5 business; it requires that a manager be available to make the necessary decisions, solve the necessary problems, and direct the necessary labor. In this case, both the swine operation and the grain-drying operation required constant, if not continuous, monitoring and work. Further, while insurance does, of course, reduce the out-of-pocket cost of replacing expensive equipment, the presence of a manager-operator makes less likely the need to replace stolen or vandalized equipment. [5]
*476 We also find, as a corollary and as a result of the above finding, that the habitation upon the farmstead is used in the corporation's business as a residence for its on-site manager-operator. The corporation is, therefore, entitled to deduct the depreciation and utility expense deductions disallowed by the Commissioner. Secs. 162 and 167. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, and attendant regulations as amended and in effect for the relevant years, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. Petitioners offered no evidence in opposition to the Commissioner's determination that the fair rental value of the lodging was $400 per month for the taxable years at issue or in opposition to the Commissioner's determination of the amount of the utility expenses.↩
3. Lodging for purposes of sec. 119 includes all commodities necessary to make lodging habitable including gas and electricity. Harrison v. Commissioner,T.C. Memo. 1981-211↩.
4. This case is a companion to Denny L. Johnson and Mary Jane Johnson, et al. v. Commissioner,T.C. Memo. 1985-175↩, in that the testimony of the non-petitioner witnesses in this case was incorporated into the record of the companion case. The two cases were not otherwise consolidated for trial, briefing, or opinion.
5. McDowell v. Commissioner,T.C. Memo. 1974-72↩.